OF

# THE SUPREME COURT

OF THE

## STATE OF ILLINOIS,

DECEMBER TERM, 1855, AT SPRINGFIELD.

---

The Chicago, Burlington and Quincy Railroad Company,
*v.* Isaac G. Wilson.

### APPLICATION FOR A MANDAMUS.

The grant to a railroad company, to construct a road, with such appendages as may be deemed necessary for the convenient use of the same, will authorize them to acquire land by condemnation for work-shops, &c.—these being necessary appendages.

This power is not exhausted by an apparent completion of the road, if an increase of business shall demand other appendages, or more room for tracks.

On an application to a judge for the appointment of commissioners to condemn lands, he is compelled to act, if such a case is made as the statute directs. He is rather a ministerial than a judicial officer.

THIS application for a mandamus was founded upon a petition to the Honorable I. G. Wilson, Judge of the Thirteenth Judicial Circuit, asking the appointment of commissioners to fix the compensation to be made for appropriating certain lands and lots to the use of the Chicago, Burlington and Quincy Railroad Company, for constructing and maintaining thereon "turn-outs, depots, engine houses, shops and turn-tables."

The Judge denied the petition, for the following reasons: Because the charter of the company did not grant the power to condemn lands for shops; because, if the power ever existed, it has been exhausted, the road having been built and running regularly, and the company having located its line, stations, depots, turn-outs, &c., two or three years since; because the company does not show, by proof, that said lands are necessary or required for the purposes stated; and because the company does not prove,

nor in any way show, that it has not been able to acquire the lands by purchase.

Judge Wilson agreed, if the court should be of opinion that commissioners should be appointed, to waive the necessity of an alternative mandamus.

This company was incorporated in 1849, under the name of the Aurora Branch Railroad Company.

The other facts necessary to a correct understanding of the case will be found stated in the opinion of the court.

J. F. Joy, for the Application.

A. Lincoln and G. Goodrich, *Contra.*

Caton, J.    By its charter the railroad company, which is the relator here, was authorized to construct a railroad on the prescribed route, "with such appendages as may be deemed necessary for the convenient use of the same," and to acquire the right of way or title to land necessary therefor.    On the 26th of November, 1855, the railroad company, under the law of the 22nd of June, 1852, filed its petition in the office of the clerk of the Circuit Court of Kane county, for the purpose of procuring, by condemnation, the premises described therein, "for the purpose of constructing and maintaining thereon turn-outs, depots, engine houses, shops and turn-tables."    In pursuance of notice given as required by the Act, application was made to the Circuit Judge for the appointment of commissioners to appraise the damages which the owners of the premises would sustain, by having them taken by the company, for the purposes stated in the petition.    On the hearing, one of the owners of a portion of the land sought to be condemned appeared and resisted the application; and, at his instance, the president of the company was sworn, and stated that the ground was principally sought and needed for the purpose of erecting shops thereon, for the repair of cars and locomotives.    After hearing the parties, the Circuit Judge, as he certifies, "denied the application, for the reason, mainly, that under the language of the charter, the company have not the power to condemn the lands for the purpose of erecting shops thereon," and filed the following stipulation : " If, upon the foregoing petition and evidence, the court shall be of opinion that the commissioners should be appointed as asked for, I hereby waive the necessity of an alternative mandamus, and consent that an absolute mandamus be awarded in the first instance."

We think the Circuit Judge misconstrued the language of the charter of the company.    It is authorized "to maintain and con-

tinue a railroad, with a single or double track, *and with such appendages as may be deemed necessary for the convenient use of the same.*" We cannot entertain a doubt that shops for the repair of cars and locomotives are appendages necessary, for the convenient use of a railroad. In construing both contracts and laws, courts must necessarily apply their general knowledge of the subject matter to which they refer. We know what is a railroad, a car, and a locomotive, and their relative uses, and at least some of the purposes to which they are applied and some of the incidents resulting from their use. To deny that we know that freight houses and depots, that switches, side-tracks, wood yards and water tanks, are necessary appendages to the convenient operation of a railroad, would admit a degree of ignorance which would unfit us for the places we occupy. These are things known to all men in this country, at least, whether skilled or not in that department of business. We know, too, equally well, in common with all of common experience and observation, of what is going on around us, that the rails by use become damaged, and have to be taken up and repaired, and that cars and locomotives are constantly liable to break and become unsafe and unfit for use till repaired ; and the means for making such repairs are certainly necessary for the convenient use of the road. It is not a reasonable or satisfactory answer, to say that they may be sent away to the manufactories for repair. While it might be possible to do so, the delay and expense would render it very inconvenient, to say the least, both to the company and the public. It is possible to operate a railroad without depots, for they are not as indispensable as the track or the cars, or the motive power ; and yet we do know that all railroad companies provide themselves with depots as fast as practicable ; and we have equal knowledge of the fact that all roads provide repair shops as soon as practicable. It would be hard to find a railroad company, in all this country, which has operated a road of any considerable extent for a single year, without erecting for itself shops for the repair of its cars and locomotives. The question is, what did the legislature mean by the word appendages ? They certainly meant something connected with and accessory to the road, and not the road itself. We must presume that the law-makers had a general knowledge of what accessories were necessary to the convenient operating of a railroad, and that among these were, almost indispensable, shops for repairing the rolling stock. There can be no doubt that they intended to embrace all such conveniences as would be necessary for the successful conduct of the business of the road, as depots, repairing shops, and the like, under this general designation, without particularly specifying either. The history of this class

of our legislation shows that such was the intention and understanding of the legislature. In some railroad charters more, and in some less, of these conveniences are specially authorized, while in others none are particularized; while in all cases, lest some should be omitted, some general expression is used, with the manifest design to cover all that may be found useful and convenient. In many of the former, *shops* are expressly named. Of this legislation, I shall only refer to two cases. The act of the 22d of June, 1852, entitled "An act to amend the law condemning right of way for purposes of internal improvement," is the one under which this petition was filed. Quoting only so much of the first section of that act as is applicable to railroads, it is provided: "That when any" "railroad" "shall have been located by any" "corporation vested with power to take and apply private property in the construction or use of such road," "or for any purpose connected with the same," "such as constructing" "embankments, excavations, spoil-banks, turn-outs, depots, engine houses, *shops*, or turn-tables;" "and the right or title to property required for any such uses or purposes, cannot be acquired by purchase; a petition shall be filed in the clerk's office of the Circuit Court," &c. Now, it is manifest that the legislature here understood shops were necessary *appendages* to the convenient operation of railroads. Again: the same thing is manifest in the general railroad law of 1849, by the third subdivision of the twenty-first section of which, companies organized under that law are authorized "To purchase, and by voluntary grants and donations receive, and by its officers, engineers, and surveyors and agents, enter upon and take possession of and hold, and use all such lands and real estate, and other property as may be necessary, for the construction and maintenance of its railroad and stations, depots, and *other accommodations* necessary to accomplish the object for which the corporation is created, but not until compensation," &c. Here the legislature has specified a few of the objects supposed to be necessary, and embraced the others in the general term, *accommodations*, which a subsequent part of the same law shows was understood and intended to embrace *shops;* for, by the 8th specification of the 28th section, the railroad companies are required to report "The number of engine houses and *shops*, of engines and cars, and their character."

I take this to be simple demonstration that the legislature intended to grant to companies, organized under that act, the right to acquire grounds on which to erect shops, and that too under the general designation of *accommodations*. They certainly understand this word to embrace shops, else they were required to report that which they were not authorized to con-

struct and hold, which would be simply absurd. I assume, then, that it will not and cannot be denied that the power was granted to these companies, to acquire grounds on which to erect shops, and if so, then the same law granted to this company the same right, even if it had not been conferred by its original charter, for the last section of that law provides as follows : "All existing railroad corporations, within this State, shall respectively have and possess all the powers and privileges, and be subject to all the duties, liabilities and provisions contained in this act, so far as they shall be applicable to their present conditions, and not inconsistent with their several charters ; and all railroad companies, that are now constructing their roads, may acquire titles to lands necessary for that purpose, under the provisions of this act." This company was already in existence, and I presume it will hardly be contended that this provision of the general railroad law, which authorized the erection of shops, was inapplicable to it or inconsistent with its charter. This law, so far as applicable to and not inconsistent with the original charter of this company, became a part of its charter, as well as the several special amendments thereto which have been subsequently passed by the legislature, and which, for the purposes of the present inquiry, it is not necessary to advert to particularly.

We are of opinion that the Circuit Judge was mistaken in his construction of the charter of the company, that it was not authorized to acquire lands by condemnation, for the purpose of constructing shops thereon, and this, too, whether we confine ourselves to the language of the original charter, or look to the provisions of the general railroad law subsequently passed, the provisions of which are made applicable to it.

Having thus settled the question upon which the difficulty arose in the mind of the Circuit Judge, and upon which he refused the application, we might, perhaps, without impropriety, dismiss the subject here, but some other questions were discussed at the bar, which we deem it proper to dispose of now. One of these is, that the road itself having been actually completed and running, the power to condemn land, either for the track of the road, or for depots or other appendages, is exhausted. In this view we cannot concur. It would be a disastrous rule indeed to hold, that a railroad company must, in the first instance, acquire all the grounds it will ever need for its own convenience or the public accommodation. Here our railroads are built through extensive districts of country, at present almost entirely unimproved, and which now afford no business whatever, but which are as fertile as any in the world, and which, ere many years have elapsed, will probably be peopled with an industrious and prosperous population, affording an immense business to the

roads which pass through them. Probably not one-tenth of the land in the vicinity of this very road is now in cultivation, but no one, acquainted with the subject, can doubt that it is destined, at no distant day, to be brought into as high a state of productiveness as any of the older States. This will increase the population ten-fold, and may reasonably be expected to increase the business of the road in the same ratio, and hence there must be a corresponding increase of the rolling stock to do this increased business, requiring also a greater amount of machine-shops for its repair, as well as an increase of depots and other accessory accommodations. We cannot suppose that it was the intention of the legislature to oblige the company to acquire all the land, in the first instance, which, in any event, it should ever want, to do the largest amount of business it may ever hope to attain. The greatest degree of sagacity could hardly determine precisely what conveniences the future might demonstrate to be necessary to do its business with facility. It may be said that the company should, for the future, depend upon voluntary purchase, having exhausted its power of condemnation, as is supposed. But if its power to condemn is exhausted, then its right to purchase, or acquire in any other way, is also exhausted, for it possesses neither, only as it is granted by its charter, and that gives authority to acquire, by condemnation, whenever it does by voluntary purchase. We are of opinion that the company still has the right to acquire such lands as it may need for the accommodation of its business, from time to time, by the coercive process pointed out by the law.

The remaining objection urged is, that in determining whether such a case was made before him as required the appointment of commissioners, the circuit judge acted judicially, and in such a case we cannot grant a mandamus to require him to reverse his decision. Granting the assumption, and the conclusion legitimately follows. We cannot by mandamus control the judicial action of any inferior tribunal. We can, in such a case, only set it in motion, and require it to act one way or the other, but without determining how it shall act. And so, too, where the inferior tribunal is vested with a discretion in the performance of a duty imposed by the law. We can only compel the performance of the duty, without controlling that discretion or saying how the duty shall be performed. Here the act to be performed by the circuit judge is strictly of a ministerial character, and so it was determined by this court, in the case of *The Illinois Central Railroad Company* v. *Rucker,* 14 Ill. 153, where a mandamus, in precisely such a case, was awarded by this court. When such a case is made as is required by the statute, the judge has no discretion whether he will appoint commissioners or not.

It is his imperative duty to do so. Necessarily he must look to see whether such a case is presented as authorizes and requires him to act, and such is the case with every officer who is called upon to discharge a ministerial duty. The sheriff, before he makes a deed, must examine and determine whether there was a valid judgment, execution and sale under it. A clerk, before he issues an attachment or a capias, must examine and see whether the affidavit, on which the application is made, is such as the law requires, and so of every other ministerial duty which any officer is required to perform, and although, in determining whether the act should be done the officer may have to decide, in his own mind, important legal principles, as is often the case, yet that does not make such decision a judicial act, which can only be reviewed on appeal. Such is not the true test of the judicial character of an act. A distinction was attempted to be drawn between this and other similar duties, from the fact that the adverse party is required to be notified to appear before the judge, at the time of the application for the appointment of the commissioners, and hence it is inferred that he has a right to contest the right of the applicant to have the commissioners appointed. He may undoubtedly show, if he can, that such a case is not presented, as requires the judge to act at all, but the important and substantial purpose for which he is called there is, that he may be heard upon those matters in which the judge may properly exercise a discretion; that he may see that none but fair and impartial men are appointed commissioners. Beyond this the law has vested no discretion in the officer which it has appointed to make the selection for the parties. If the officer applied to may refuse to appoint them, in one case where the law has been complied with, he may in all cases, although never so clear a case is made out, and as the company has no redress but by mandamus, if his determination is held to be judicial, and not examinable on such an application, it is in the power of any of the various officers to whom this application may be made, to stop the progress of a railroad altogether. Such was never the intention of the legislature.

It is no answer to say that if one officer erroneously refuses to make the appointment, application may be made to another. Granting this to be so, and it is no more the duty of the last to appoint than it was of the first. And there is no more certainty that he will do so, and if there is no remedy against the first refusal, there can be none as to the last, and the party may be left without remedy. It is the duty of each to act when a proper case is made, requiring action. One officer might think that the company is asking too much ground for a depot, or that it has made an injudicious selection, and that a depot is not needed at

9

the proposed place. Another might be of opinion that the road was injudiciously located, and require it to be changed, before he would appoint the commissioners to enable it to acquire the property. It is possible, it is true, that a company may abuse the trust reposed in it, and seek to acquire property not needed for the purposes of the road or its business, but if such objections were listened to, for the purposes of vesting in the various ministerial officers, whose duty it is made to assist in acquiring the necessary property for the use of the road, the right to determine where the road shall be made, or where a depot shall be located, or how much land is wanted for a wood-yard, or where a water tank shall be erected, a far greater evil would result than the one attempted to be avoided. The legislature had a very satisfactory assurance, that the powers granted to these corporations would not be abused by coercing from the citizens more land than was necessary for the legitimate purposes of their roads. The land thus acquired, can only be held and used for specific purposes. They are not authorized to speculate and traffic in the land thus acquired, but can only hold it for the purpose of the railroad and its business accommodations. With this limited right to hold land, it was not to be supposed that any company would be so blind to its own interest as to go to the expense of acquiring land which could be of no use to it. It would have been just as reasonable to have provided in the charter, that the company should not throw away its money in any other useless and aimless mode. It is possible, it is true, that a company might, in disregard of its duty to itself, to the State and to individuals, apply to condemn land which it did not need, and for purposes other than those authorized by the law. When such a case of bad faith, abuse of power and violation of duty occurs, the law will readily find a remedy adequate to the protection of both the public and private rights, but we can see no pretence of such a case here, it being established that the purpose for which this land is sought to be acquired is such as is authorized by the company. Had the judge been correct in his construction of the charter, that the company was not authored to acquire land for the purposes for which this was sought, then a case had not been presented which required him to act at all, and he would have been justified, and it would have been his duty, to refuse to appoint commissioners. In pursuance of the stipulation filed, a peremptory mandamus must be awarded.

---

SKINNER, J. I do not understand the foregoing opinion as approving the doctrine contended for upon the argument, that

it is the sole province of the corporation to determine *what* property its exigencies require, and that such determination is conclusive upon the courts. Whether the corporation has the right to coerce the condemnation of the property sought to be condemned and taken, or any part thereof, is a question for judicial determination, and never intended by the legislature to be conferred upon the corporation. The appointment of commissioners, by the court or judge, is the inception of the proceeding which is to terminate in final adjudication upon the rights of the parties, and not an adjudication which determines those rights, and in its nature is a ministerial act.

In this view of the case I concur in the opinion of the court.

*Mandamus awarded.*