THE STATE BOARD OF EQUALIZATION *et al.*

*v.*

THE PEOPLE *ex rel.* County of Alexander.

*Opinion filed October 23, 1907.*

1. TAXES—*property needed by Illinois Central railroad to reach Ohio river is within charter tax provision.* In view of the facts that the acts of Congress in aid of the construction of the Illinois Central and Mobile and Ohio railroads contemplate a railroad connecting the great lakes with the Gulf of Mexico, and that the Illinois General Assembly accepted the provisions thereof, property needed by the Illinois Central railroad to enable its traffic to reach the Ohio river falls within the provisions of its charter relating to the substituted method of taxation.

2. SAME—*fact the tax-payer fails to pay taxes does not affect method of taxation.* The fact that the Illinois Central railroad has not apportioned the earnings of its bridge across the Ohio river with the approach thereto on the Illinois side, so that no earnings are credited to the approach as being a part of the charter lines of the company, does not affect the determination of the question as to how such approach shall be regarded with reference to taxation.

3. SAME—*charge for use of leased line is part of the company's earnings.* The fact that the legislature, by an act subsequent to the Illinois Central Railroad Company's charter, authorized that company to lease its lines does not take such lines out of the charter exemption with reference to taxation, provided the lines were such as were authorized by the charter; but the earnings of such lines, by whatever name called, are part of the gross "proceeds, receipts or income" of the road.

4. SAME—*approach to bridge over the Ohio river is "railroad track."* The approach to the Illinois Central bridge over the Ohio river is "railroad track" as distinguished from a steamboat used in ferrying trains across the river, and is not taxable by the ordinary methods governing the taxation of property owned by a railroad company other than "railroad track."

5. SAME—*approach to bridge over Ohio river is not a branch or lateral line.* The Illinois approach to the Illinois Central railroad bridge over the Ohio river must be regarded as a switch or side-track authorized by the company's charter and not as a branch or lateral railroad, and comes within that class of property for which the charter of the company provides a method of taxation, and is not subject to the ordinary methods of taxation.

6. EMINENT DOMAIN—*power to condemn for switches or side-tracks is a continuing one.* The power of a railroad company to condemn land for necessary switches or side-tracks is not exhausted by the location and completion of the main line but is a continuing one, which may be exercised from time to time, as the needs of the company may require.

APPEAL from the Circuit Court of Sangamon county; the Hon. O. P. THOMPSON, Judge, presiding.

This is a petition filed by the People *ex rel.* the county of Alexander, the city of Cairo and the board of education of the city of Cairo, against the State Board of Equalization of the State of Illinois, in the circuit court of Sangamon county, for *mandamus* to compel the said board and its officers to value and assess for taxation the property known as the "Illinois Central bridge approach of the Chicago, St. Louis and New Orleans Railroad Company," which leads to the bridge across the Ohio river at Cairo, Illinois.

The petition alleges, among other things, that the Illinois Central Railroad Company was incorporated under an act of the General Assembly of the State of Illinois, approved February 10, 1851; that by the second section of said act the company was authorized and empowered to survey, locate, construct, complete, alter, maintain and operate a railroad, with one or more tracks or lines, from the southern terminus of the Illinois and Michigan canal to a point at the city of Cairo, with a branch of the same to the city of Chicago, on Lake Michigan, and also a branch *via* the city of Galena to a point on the Mississippi river opposite the town of Dubuque, in the State of Iowa; that by the third section of said act the said company was given the right of way upon and authorized to appropriate to its own use and control, for the purposes contemplated in said act, a strip of land not exceeding 200 feet in width through its entire length, and to enter upon and take possession of and use all and singular any lands, streams and materials of

every kind, for the location of depots and stopping stages, for the purpose of constructing bridges, dams, embankments, excavations, station grounds, spoil-banks, turn-outs, engine houses, shops and other buildings necessary for the construction, completing, altering, maintaining, preserving and complete operation of said road; that by the fifteenth section of said act the State of Illinois ceded and granted to said corporation, among other things, all the lands which might be selected along the lines of said road and branches within the State under the act of Congress of September 20, 1850, entitled "An act granting the right of way and making a grant of land to the States of Illinois, Mississippi and Alabama, in aid of the construction of a railroad from Chicago to Mobile," but that said cession and grant were made by the State for the only and sole purpose of surveying, locating, constructing, completing, altering, maintaining and operating said road and branches, as provided for in said act of incorporation; that by the third subdivision of said section 15 the main trunk or central line of said railroad was required to run from the city of Cairo to the southern terminus of the Illinois and Michigan canal.

The petition further alleges that soon after the passage of the said act of February 10, 1851, the Illinois Central Railroad Company entered upon the construction of its railroad and had the same completed and in operation before the expiration of the year 1855; that in the construction of its road at and near the city of Cairo it obtained, by purchase, a strip of land in the upper or northern part of the city, known as the "Illinois Central 500-foot strip," extending from the Ohio to the Mississippi river, and that the company's right of way of the width of 200 feet approached this strip from the north and entered the same about midway between the two rivers, and after entering said strip its tracks and right of way turned to the left and ran out to the Ohio river, and from that point its tracks were laid upon and extended southward on the Ohio river levee for

a distance of about two miles to Second street, in the city of Cairo, and then on block 1, in said city, said company built its passenger station, and said place was then and there selected and established by said company as the southern terminus of said road and as such has been kept and maintained up to the present time,—a period of fifty years,—and that said company has at no time had or maintained any other point, place or station in Illinois as the southern terminus of said road, and that it has continuously used and operated its road to and from said station as the southern terminus of its said railroad in Illinois, as provided for and authorized by said company's act of incorporation.

The petition further alleges that within a few years after the completion of said road the Mobile and Ohio Railroad Company completed its railroad from the city of Mobile, Alabama, to the city of Columbus, Kentucky, situated on the Mississippi river twenty miles below the city of Cairo, and that for a number of years connection was made between these two railroads by means of a steamboat, called "The Illinois;" that this arrangement was soon discontinued and the Illinois Central Railroad Company entered upon the work of making the city of New Orleans the extreme southern terminus of its road or system of roads and obtained possession and control of certain railroads in Louisiana, Mississippi and Tennessee, and after the operation of them for a time in connection with a road built by it or other companies from Columbus to a point on the Ohio river opposite Cairo, Illinois, it procured, about the year 1880, the consolidation of these roads and the formation of a new company, to which it gave the name of the Chicago, St. Louis and New Orleans railroad, under the acts of the legislatures of Louisiana, Mississippi, Tennessee and Kentucky, and that on June 13, 1882, it took from the Chicago, St. Louis and New Orleans Railroad Company a lease for a term of four hundred years from July 1, 1882, upon its railroad extending from the city of New Orleans,

229—28

through the States last mentioned, to said point opposite Cairo, Illinois; that the Mobile and Ohio Railroad Company on January 1, 1886, procured a lease upon the St. Louis and Cairo railroad, extending from Cairo, Illinois, to St. Louis, Missouri, for a term of forty-five years, and St. Louis has become the northern terminus of said Mobile and Ohio company's road and New Orleans has become the southern terminus of the Illinois Central lines.

The petition further alleges that on March 29, 1886, the Illinois Central Railroad Company and the Chicago, St. Louis and New Orleans Railroad Company procured from the legislature of the State of Kentucky an act authorizing them, or either of them, to build a railroad bridge across the Ohio river at or near the said city of Cairo, and that shortly thereafter the said companies began the construction of said bridge and that the same was completed and opened for traffic in October, 1889; that said bridge was built 60 feet above high-water mark; that the bridge proper is about one mile in length and each of the approaches to said bridge about one and one-half miles in length, and consist of steel viaducts and high earth embankments; that the steel viaduct part of the Illinois approach is 2656 feet in length and the earth embankment is 5307 feet in length; that the bridge was first a single track bridge throughout, but now the Illinois approach is double-tracked; that the Illinois Central Railroad Company is said to have built the Illinois approach and the Chicago, St. Louis and New Orleans Railroad Company the Kentucky approach and the bridge proper across the river to the Illinois shore, which is the boundary line between the two States.

The petition further alleges that the Illinois Central Railroad Company, in order to obtain sufficient land upon which to build its said approach, purchased from the trustees of Cairo trust property a strip of ground extending north along the west side of its right of way from the point where its right of way enters said 500-foot strip for the

distance of about one mile, containing 17.60 acres, and on
this strip and on its original right of way it built that part
of its approach consisting of earth embankment; that a con-
siderable portion of said embankment is entirely off of said
original right of way and wholly on the said strip of 17.60
acres, and that said earth embankment at its junction with
the said steel viaduct is of the height of about 50 feet and
of the width of about 185 feet at its base, and that the
same diminishes in height and width from that point to
its junction with the main line of the company; that said
steel viaduct, which turns to the east and connects with said
bridge, crosses 50 or 60 feet above the surface tracks of
said company and the tracks of the Cleveland, Cincinnati,
Chicago and St. Louis Railway Company, and the said ap-
proach nowhere touches any of the tracks of said company
except at the point of the junction at the foot of the ap-
proach with the main line, a mile and a half from the river;
alleges that said approach is no part of the company's right
of way or railroad tracks as the same have been used and
operated to its Second street station for fifty years, and that
said approach is no part of said bridge and is known and
called by no other name than "the bridge approach;" that
said approach is not a spur track or a turn-out track, but
is a branch or lateral road of the company, which leaves
its main line three and one-half miles from its terminus at
Second street, in Cairo, and connects with another railroad
or railroad bridge at the river bank; that the company's
right of way is limited to 200 feet in width, but it has
been widened, for the distance of a mile, from 200 feet to
almost 600 feet to accommodate the approach; that the ac-
quisition of this strip of land of 17.60 acres to widen its
said right of way and the construction of the said approach
constitute a new and independent enterprise and are the
location and construction of a new road, which can only
be properly designated as a branch or lateral road of the
said company.

The petition further alleges that said company uses said bridge for the transfer of its trains running from various points and that the same has been so used by the Mobile and Ohio railroad for a number of years, and that petitioner is informed and believes that a contract exists between said companies, which is to run for twenty-five or more years, under which said Mobile and Ohio Railroad Company is to use said bridge, and that the amount now paid by it for such use to the Illinois Central company is not less than $150,000 per annum; that in addition to this income, from other and independent sources the said Illinois Central Railroad Company now collects, and has for many years collected, from shippers an extra charge of two cents per hundred on account of the said bridge, which said rate is called the "Cairo bridge toll;" that the said bridge, together with said approach, is a toll bridge, and the said toll of two cents per hundred is first taken out for said company before a division of freights is made between it and other companies; that after said company had acquired its southern lines, and up to the time of the completion of said bridge, it owned and used large transfer boats at Cairo to transfer its cars and trains across the Ohio river, and that it paid taxes, as levied from year to year, on all of such boats; alleges that the Illinois Central Railroad Company has no power or right to own, have or use any property whatever beyond what is reasonably necessary to enable it to maintain and operate its railroad extending from Cairo to the north-west and north-east corners of the State, and that said bridge approach is in no way either necessary or essential to the operation of said road as provided for by said act of incorporation, and it is but the northern terminus of said company's New Orleans railroad, extended into Illinois to connect with its Illinois railroad three and one-half miles north of the southern terminus of said road.

The petition further alleges that the relators herein applied by petition to the State Board of Equalization of this

State, at its September term, 1905, and requested it to value and assess the said bridge approach for the purposes of taxation; that said petition was referred by said board to its committee on the assessment of railroad property, and that said committee, on November 8, 1905, reported, in writing, to the board, that said bridge approach was not, in their judgment, assessable by the board, and that said report was then and there adopted, and of such action the relators were officially notified by the secretary of said board on November 9, 1905; alleges that the Illinois Central Railroad Company had expended in the construction of said approach up to February, 1902, about $375,000, and that since that time it has been widened and greatly improved and is of the value of not less than one-half a million dollars, and that it is wholly within the county of Alexander and school district No. 1, over which the board of education of the city of Cairo has jurisdiction, and that about 4000 feet of said approach is within the city of Cairo and that about 4000 feet is without the limits of said city, but inasmuch as the north end of said approach runs near to and into the original main line of said railroad, petitioner, for the purposes sought by this petition, does not include the north 1300 feet of said approach. A description of the portion of the bridge approach which it is sought to have valued and assessed is then set out.

The petition makes the State Board of Equalization, and the officers and members thereof, (naming them,) defendants, and prays that upon proof of the allegations of said bill a writ of *mandamus* may issue against the said State board, and each and every member thereof, commanding it and them to assess and value, for the purpose of taxation, the said bridge approach as above described, first assessing the whole of said bridge approach for the distance of 6463 feet for the purpose of the extension of the State, county and school taxes, and then assessing and valuing separately, for the purpose of the extension of the city taxes

of the city of Cairo, that part of the approach within said city, and that said board, and each and every member thereof, be required to make like assessments and valuations of said approach and of said last mentioned part thereof as omitted property for the years 1890 to 1904, both inclusive, and certify their assessments and valuations to the county clerk of the said county of Alexander, and do all other acts requisite to the full and complete assessment of said property and the certification of the same, as required by law.

The answer filed by the defendants denies all the allegations of the petition except in so far and to the extent as therein admitted; alleges that pursuant to the act of Congress referred to in the said petition, the General Assembly of the State of Illinois, for the purpose of carrying out the object and purposes of said Congress, passed an act entitled "An act to incorporate the Illinois Central Railroad Company," approved February 10, 1851; that said act was duly accepted by said company within sixty days after its passage, as provided in section 23 of said act; that said act constitutes the charter of said railroad company, and by its acceptance, as aforesaid, it became a valid existing contract between the said company and the State of Illinois. The answer then sets out sections 1, 2, 3, 8, 10, 11, 15, 18, 22 and 27 of the said act, and alleges that after the passage and acceptance of said charter, as aforesaid, the said company surveyed and located its railroad and branches and began work on the main trunk thereof before January 1, 1852, as required by section 23 of its charter, and completed its road and branches and had the same in operation before the expiration of the year 1855; that in the location and construction of its railroad at or near the city of Cairo, for the purpose of securing suitable and proper right of way lands for main tracks, depots, station grounds, switch yards, side-tracks, switch tracks, turn-outs, engine houses, shops, and all other structures needful or necessary for the construction, maintaining, altering, preserving and the complete

operation of its railroad, as contemplated by its charter and the said act of Congress providing for the construction of a railroad from Chicago to Mobile, said company on October 15, 1853, purchased from the trustees of Cairo city property, for the southern terminus of its road in the city of Cairo, a strip of land in the upper or northern part of said city extending from the Ohio to the Mississippi river, commonly known as the "Illinois Central 500-foot strip;" also a certain other strip of ground 200 feet in width lying north of and intersecting said 500-foot strip about midway of the two rivers; also two certain other pieces of land lying south of said 500-foot strip in the southerly portion of said city, one tract being 1000 feet in width and extending from Fourteenth to Eighteenth street, and the other 450 feet in width, now constituting block 1, at Second street; also the right to lay and operate a double line of rails from said 500-foot strip down and upon the Ohio river levee embankment to the two said tracts last mentioned; that said company thereafter constructed its said railroad upon and over said lands and built a passenger depot on said ground at Second street, and has ever since maintained the same, and established freight houses, depots, engine houses, switch yards, with side-tracks, etc., on said piece of ground between Fourteenth and Eighteenth streets, in said city of Cairo, and has ever since maintained the same; also constructed and laid down lines of main track over the said 200-foot strip south to said 500-foot strip, and thence curving to the left over, upon and along said 500-foot strip to the Ohio river, and from that point southward along said levee embankment to said freight and passenger depot aforesaid, and has ever since maintained and operated the same, with many side-tracks and switch tracks connecting therewith, upon said several pieces of ground above described within the city limits of said city of Cairo, including said 500-foot strip, which for many years has been known as its North Cairo yard, all of which lands were originally selected and have

ever since constituted the southern terminus of said company's railroad at Cairo, Illinois; alleges that within a few years after the completion of the Illinois Central railroad the Mobile and Ohio Railroad Company completed its road from Mobile to the city of Columbus, Kentucky, and that for a number of years connection was made between the two roads by a steamboat, called "The Illinois," but that this arrangement was in due course of time discontinued, owing to the increasing demands of commerce. The answer then sets forth a number of reasons for such discontinuance, among which was the consolidation of several southern lines of railroad into the Chicago, St. Louis and New Orleans Railroad Company and the extension of the line of the Mobile and Ohio Railroad Company from Columbus to a point on the Ohio river opposite the city of Cairo, and from that time until the completion of the bridge across the Ohio river the use of transfer boats for the transfer of cars and trains across the said river; admits that for a period of over twenty years, during the operation of said boats, in addition to the seven per cent charter tax exacted of it by the State of Illinois, it paid special taxes on said transfer boats, but that said taxes on said boats were paid only because steamboats were not such property as contemplated by section 22 of its charter; that said connections across the Ohio river became wholly inadequate to meet the growing demands of commerce, and it was absolutely necessary to the successful and complete operation of both the Illinois and southern lines that some more expeditious and satisfactory means of connection across said river should be devised; that on March 29, 1886, the Chicago, St. Louis and New Orleans Railroad Company procured from the legislature of the State of Kentucky an act authorizing the said company and the Illinois Central Railroad Company, or either of them, to build a railroad bridge in the State of Kentucky, at or near the city of Cairo, across the Ohio river to the boundary line between the States of Kentucky and Illinois;

that prior to this time, on June 13, 1882, the Illinois Central Railroad Company had leased the lines of the Chicago, St. Louis and New Orleans Railroad Company, extending from New Orleans to a point opposite the city of Cairo, for a term of four hundred years from July 1, 1882; that in pursuance of said act the last above named company at its own expense constructed the said bridge and has ever since owned the same as part of its railroad, together with the Kentucky approach, and that said bridge extends across the Ohio river to the said 500-foot strip; that because of the increasing business of the Illinois charter lines of the Illinois Central railroad it became necessary that said company connect its then existing tracks with the tracks of the said bridge; that said bridge was built 53 feet above high water, and because of the altitude of said bridge, in order to properly lay the necessary tracks connecting said bridge with the then existing line tracks and give the same the necessary curve and grade to reach the elevation of the bridge and pass around and over existing tracks of said company, it became absolutely necessary that additional ground adjacent to and touching said original way lands acquired in 1853 should be obtained, and that thereupon, for the purposes aforesaid, said company, on April 18, 1889, obtained, by deed from the trustees of the Cairo city property, an additional strip of land containing 17.60 acres, and after procuring said strip of land said company at its own expense constructed said Illinois Central bridge approach, and laid tracks thereon connecting its main line with the rails on said bridge; that said bridge was completed and opened for traffic in October, 1889.

The answer further alleges that all of the tracks of the Illinois Central Railroad Company, and other railroads entering Cairo, are laid upon embankments 12 to 16 feet above the natural ground, but because of the necessity therefor the tracks of said company leading to said bridge were laid at a much greater altitude, partly on an earth embank-

ment and partly on steel trestles; that the entire length of said tracks leading to said bridge is 7963 feet; that the northerly portion thereof, 5307 feet in length, is laid on an earth embankment, the northerly end thereof, intersecting with the earth embankment on which the main tracks are laid, at that point being about 15 feet above the natural surface and thence extending southward, bearing gradually to the right, away from the main track embankment, and then curving to the left towards the bridge, with a gradual increasing height and width until it reaches the southerly end of the embankment, where the height is about 50 feet and its width 185 feet at its base; that of the land covered by said 5307-foot embankment 7.5 acres is of the land purchased in 1889 and 8.2 acres is of the original way lands acquired in 1853; that the southerly portion of said tracks, 2656 feet in length, leading to the bridge, is laid on a steel viaduct commencing at the terminus of said earth embankment and curving towards and extending to the bridge, all of which is upon the original way lands acquired by the Illinois Central Railroad Company in 1853; that the said earth embankment is double-tracked, and that the Illinois Central Railroad Company is now engaged in filling in with earth the space covered by said steel viaduct, and proposes to make the said bridge approach a continuous earth embankment, except at crossings, where concrete or steel viaducts will be maintained, and lay a double track thereon to said bridge, all of which work and additional tracks were and are necessary to meet the demands of commerce and the increasing business of said road.

The answer denies that said bridge approach is a "branch or lateral railroad" of the Illinois Central railroad, or an "independent enterprise," or "the northern end or terminus of the Chicago, St. Louis and New Orleans Railroad Company," but, on the contrary, avers that said tracks and superstructure are a part of the Illinois Central Railroad Company's railroad constructed in pursuance of its char-

ter, and that said approach, and the tracks laid thereon, to
said bridge are absolutely indispensable and necessary for
the proper operation of said road; admits that said steel via-
duct leading to said bridge crosses 50 or 60 feet above the
surface tracks of said Illinois Central Railroad Company,
and that none of said tracks touch any of the tracks of said
company except at the point of their junction with the main
line, a mile and a half from the river, and alleges that it
was practically impossible to construct said tracks other-
wise; that the southern terminus of said road is not solely
at its passenger depot in' the city of Cairo, but is at said
city, and embraces all of the land and tracks owned by said
company at that point; that the southern terminus of the
Chicago, St. Louis and New Orleans Railroad Company is
at New Orleans and its northern terminus is its said rail-
road bridge over the Ohio river; alleges that about Janu-
ary 2, 1889, the Illinois Central Railroad Company and the
Mobile and Ohio Railroad Company, which operated a road
from Mobile to St. Louis through the city of Cairo, entered
into an agreement for the joint use of the Illinois Central
passenger station in the city of Cairo, and its tracks from
the junction with the bridge approach leading thereto, and
the joint use of the Mobile and Ohio company's switch
tracks on the opposite side of the river, and giving the right
to said company last mentioned to use said bridge and the
approaches thereto for the purpose of transferring its trains
and cars across the said river, for which said company pays
to the Illinois Central company the sum of $150,000 per an-
num, and that in addition to such use of said bridge the
said Illinois Central company uses it for the transfer of all
its trains and cars which require transfer across the said
river; avers that it had the power and authority to build
and operate said bridge approach not only under the provi-
sions of its charter, but by virtue of the act of the General
Assembly of February 25, 1867; denies that said company
claims that said approach is exempt from taxation by the ·

provisions of its charter, but avers that it cannot be subjected to any further or additional tax than said charter tax, to be assessed and paid as provided in said charter.

The answer denies that said bridge, or any part thereof, is a toll bridge, but admits that the tariff rates on through freights carried over said bridge include a charge of two cents per hundred on account of the bridge proper, and that before a division of freights takes place between the different companies entitled thereto, the said two cents per hundred is first taken out and paid to the Chicago, St. Louis and New Orleans Railroad Company or its lessee, and that said charge is solely for carriage over the bridge proper and not over either of said approaches; admits that petitioner made application to the State Board of Equalization to assess and value said approach for purposes of taxation and that the action taken thereon was as stated in said petition; alleges that said company pays, and has always paid, taxes on its said property not held for railroad purposes or in use in the operation of its road, to the full extent paid by other owners of like property, and as to the property held and used by it for railroad purposes, including said Illinois Central bridge approach, it pays a charter tax far in excess of taxes paid by other railroad companies owning like property in the State of Illinois; admits that said approach has cost up to the present time $500,000; that it is wholly within the county of Alexander and school district No. 1, and that the northerly portion thereof, (north of the city limits and of the length of about 4000 feet,) for the distance of about 1300 feet at the north end thereof, runs near to and into and consists of a considerable portion of the original earth embankment on which said company's original main tracks are laid; that the southerly portion of said approach of a length of about 4000 feet is within the city of Cairo.

To the answer a general demurrer was interposed, which, upon a hearing, was sustained, and an order was entered by the court awarding a writ of *mandamus* in ac-

cordance with the prayer of the petition. From the judgment the defendants appeal to this court, and urge (1) the court erred in sustaining the demurrer to the answer; (2) the court erred in awarding the writ of *mandamus*.

GILBERT & GILBERT, for appellants:

While its charter exempts the Illinois Central Railroad Company from other than State taxes, it provides for other payments, which, though not taxes in the ordinary sense of that term, are paid, in part, in consideration of such exemption. *State* v. *Railway Co.* 108 N. W. Rep. 594.

Such provisions in the charter furnish a substitute for taxes. *Bank* v. *People,* 4 Scam. 303; *Railroad Co.* v. *McLean County,* 17 Ill. 297; *Travers County* v. *Railway Co.* 73 Minn. 417; *McHenry* v. *Alford,* 168 U. S. 651; *Wetherell* v. *Devine,* 116 Ill. 643.

The intention of Congress, as manifest both from the title and body of the act of September 20, 1850, was to aid in building a continuous line of railroad from Chicago on the lakes to Mobile on the gulf. The act of the Illinois legislature of February 17, 1851, accepting the act of Congress, pledged the faith of the State to execute its part of the trust confided to Illinois, Mississippi and Alabama; and the act of said legislature of February 10, 1851, granting the charter in question to the Illinois Central Railroad Company, was evidently in furtherance of the object expressed in said act of Congress and with a full purpose of doing all that was required of Illinois to carry out that object. Said three acts were all *in pari materia* and upon a cognate subject, and said charter should therefore be construed as the act of the legislature of the State of Illinois carrying out the intention of Congress to make the Illinois Central railroad a part of one continuous thoroughfare from Chicago to the gulf. 9 U. S. Stat. at Large, 466; Laws of Ill. 1851, 192; *Railroad Co.* v. *Illinois,* 163 U. S. 142.

The charter in question is not one of total exemption, as in Northwestern University charter, but is as broad in expression as to property belonging to the corporation and to be assessed by the Auditor and exempted from further taxes, with the added provision that it shall be construed favorably. Therefore it should receive as liberal, and even more liberal, construction than did the university charter. *Northwestern University* v. *People,* 99 U. S. 309; *People* v. *Theological Seminary,* 174 Ill. 177; *Theological Seminary* v. *Illinois,* 188 U. S. 662.

The charter in question gave power to acquire, "by purchase or otherwise, real and personal estate needful to carry into effect fully the object of the act." It also gave further express power to acquire land for building bridges and embankments, other necessary buildings, etc., not only for the construction of the road, but for "altering, maintaining and complete operation of said road," and it annexed to such power the express power to acquire such land by purchase or condemnation. The provision as to what is needful to the complete operation of the Illinois Central Railroad Company is construed liberally. Elliott on Railroads, sec. 38; *State* v. *Elizabeth,* 41 N. J. L. 319; *State* v. *Railroad Co.* 48 Md. 76; *In matter of Swigert,* 119 Ill. 89.

"Needful" is not measured or limited to the time of construction, but is determined from time to time during the operation of the road. It is a continuing power, to be exercised as occasion requires. *Railroad Co.* v. *Wilson,* 17 Ill. 166; *Railroad Co.* v. *Railroad Co.* 113 id. 162; *Fisher* v. *Railroad Co.* 104 id. 323; *Railroad Co.* v. *Dix,* 109 id. 237; *Railway Co.* v. *Railroad Co.* 149 id. 272; *Kotz* v. *Railroad Co.* 188 id. 578.

The charter in question expressly gave the power both to purchase and condemn, and such power was a continuing one. *Railroad Co.* v. *Wilson,* 17 Ill. 126; *Fisher* v. *Railroad Co.* 104 id. 326; *Railroad Co.* v. *Railroad Co.* 113 id. 162.

Delay in construction of the tracks does not prove they are not needful to the charter line at the time they were built, nor the absence of power to build them. *Railroad Co. v. Rucker,* 14 Ill. 353.

The fact that the tracks are elevated tracks does not in anywise affect the question of authority to build or the right to tax. *Kotz* v. *Railroad Co.* 188 Ill. 578.

The property in question is property of the Illinois Central Railroad Company on its own right of way,—part and parcel of the soil itself,—and is of the species of property denominated "railroad track," and is assessable only by the State Board of Equalization, if assessable at all. *People* v. *Railroad Co.* 215 Ill. 177; *Anderson* v. *Railroad Co.* 117 id. 26; *People* v. *Railway Co.* 206 id. 252.

The superstructures on the right of way cannot, as "railroad track," be assessed separate and apart from the land itself. *New Mexico* v. *Trust Co.* 171 U. S. 186; *Railroad Co.* v. *People,* 98 Ill. 350.

To specifically tax the property sought to be taxed is to extend a double tax, against which the law strictly rebels. *Georgia* v. *Railroad Co.* 66 Ga. 567; *Scully* v. *People,* 104 Ill. 349; *Chicago* v. *Collins,* 175 id. 458; *Railroad Co.* v. *People,* 218 id. 465.

The approach being "railroad track" cannot be assessed as a structure severed from the land. There is no power given in the statute to the State board to sever structures and assess the same apart from the land. *Anderson* v. *Railroad Co.* 117 Ill. 26; *Railroad Co.* v. *People,* 153 id. 413; *People* v. *Railway Co.* 206 id. 252.

LANSDEN & LEEK, and ALEXANDER WILSON, State's Attorney, for appellee:

It is fundamental and vital to the claim of exemption from taxation that authority to construct the approach be found in the charter. To find it in other acts or laws, State

or Federal, is immaterial, for they will contain no exemption sections or clauses. The exemption section of the charter cannot attach to any property the right to acquire which is traceable to some act or law other than the charter. *Railroad Co.* v. *Wright*, 116 U. S. 231; *Railroad Co.* v. *Missouri*, 120 id. 569; *Railroad Co.* v. *Ashbrook*, 146 id. 279; *Ford* v. *Land Co.* 164 id. 662; *The Delaware Railroad Tax*, 18 Wall. 206; *Tucker* v. *Ferguson*, 22 id. 527.

Approaches are parts of the bridge. The bridge proper and the approaches are a unit. *Bridge Co.* v. *People*, 176 Ill. 267.

The bridge is a toll bridge. The Illinois Central's charter provides only for charges for carriage and transportation. So were the whole bridge built under and by virtue of clearly expressed charter power it would yet be subject to taxation because of the use the company is now making of it. Exempted property may become taxable property because of the use to which its owner had devoted it. *Cairo Elevator case*, 119 Ill. 83; *People* v. *Theological Seminary*, 174 id. 177; *Board of Directors* v. *People*, 189 id. 439; 193 id. 619; *Chicago Theological Seminary* v. *Illinois*, 188 U. S. 662.

This court, in *Illinois Central Railroad Co.* v. *Irvin*, 72 Ill. 452, held that the company's steamboat, which ran between Cairo and Columbus, Kentucky, twenty miles below Cairo, was subject to taxation. Columbus was then the northern terminus of the Mobile and Ohio railroad. This court also held the company's large grain elevator at Cairo, built on its right of way and on the river bank, was subject to taxation, chiefly, if not wholly, on the ground that it had been leased to other parties. *Railroad Co.* v. *Hodges*, 119 Ill. 137; *In matter of Swigert*, 119 id. 83.

The third section of the company's charter restricts its right of way to not exceeding two hundred feet in width throughout its entire length. The additional 17.60 acres acquired by the company widened its right of way an addi-

tional two hundred feet for this bridge approach.   The additional land may have been needed for the approach, but the company's need of land for the approach cannot be said to have been for station or terminal purposes.   Nor are its needs the measure of its rights or powers.   The company could not have condemned property for this approach.   This is the true test.   *Railroad Co.* v. *Burlington,* 28 Vt. 193; *Railway Co.* v. *Milwaukee,* 34 Wis. 27; *Railway Co.* v. *Douglas County,* 103 id. 75; *Railroad Co.* v. *Wiltse,* 116 Ill. 449; *Railway Co.* v. *Railroad Co.* 149 id. 272.

The approach is a branch or lateral road.   *Railroad Co.* v. *Wiltse,* 116 Ill. 449; 12 Am. & Eng. Ency. of Law, 940; *Railway Co.* v. *Railroad Co.* 149 Ill. 272; *Biles* v. *Railroad Co.* 5 Wash. 509; *Blanton* v. *Railroad Co.* 86 Va. 618.

Mr. JUSTICE SCOTT delivered the opinion of the court:

The city of Cairo is located at the confluence of the Ohio and Mississippi rivers and occupies the southern portion of a narrow strip of land lying between these two streams.   The main tracks of the charter lines of the Illinois Central Railroad Company coming from the north, after passing the northern limits of the city, proceed south about a quarter of a mile, practically midway between the two rivers, and then turn to the east until within a few hundred feet of low-water mark on the Ohio river, when they turn in a southerly direction and proceed along the west bank of the Ohio river about two miles to the passenger depot in that city.   The tracks leading to the bridge across the Ohio leave the main line tracks about three-quarters of a mile north of the city limits and run south on the west side of the main line tracks, gradually ascending and departing a little to the west from the main line tracks but practically parallel thereto, until the tracks leading to the bridge turn to the east at a point but little south of the place where the main lines turn to the east.   The line leading to the bridge then passes over a steel viaduct

and crosses the main tracks of the charter lines at a point about 50 or 60 feet above the main tracks and about 700 feet west of the most westerly portion of the bridge proper. If the bridge and the main tracks of the charter line were on the same level, those tracks and the railroad track on the bridge could be connected by a switch approximately 700 feet in length. The accompanying plat will perhaps assist in arriving at a correct understanding of the situation:

The question is whether the tracks leading to the bridge, and the embankment and steel structure upon which they rest, should be taxed in the ordinary way for the purposes of the State and the various local municipalities, or whether they are exempt from such taxation by virtue of sections 18 and 22 of the charter of the Illinois Central Railroad Company. Appellee contends, and the circuit court held, that these tracks, and the embankment and structure upon which they rest, constitute a branch or lateral railroad of the Illi-

nois Central Railroad Company not a part of the lines the construction of which was contemplated by the charter; while appellants contend that the tracks, and the embankment and structure upon which they rest, are a part of the lines of the company constructed pursuant to the provisions of its charter and necessary for the proper operation of the road.

In 1850 the Congress of the United States passed an act which received the approval of the executive on the 20th day of September in that year, and which, so far as here material, with its title, reads as follows:

"An act granting the right of way, and making a grant of land to the States of Illinois, Mississippi and Alabama, in aid of the construction of a railroad from Chicago to Mobile.

*"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled:* That the right of way through the public lands be, and the same is hereby granted, to the State of Illinois for the construction of a railroad from the southern terminus of the Illinois and Michigan canal to a point at or near the junction of the Ohio and Mississippi rivers, with a branch of the same to Chicago, on Lake Michigan, and another *via* the town of Galena, in said State, to Dubuque, in the State of Iowa," etc.

"Sec. 2. And be it further enacted, that there be, and is hereby, granted to the State of Illinois, for the purpose of aiding in making the railroad and branches aforesaid, every alternate section of land designated by even numbers, for six sections in width on each side of said road and branches," etc.

"Sec. 4. And be it further enacted, that the said lands hereby granted to the said State shall be subject to the disposal of the legislature thereof, for the purposes aforesaid and no other; and the said railroad and branches shall be and remain a public highway for the use of the government

of the United States, free from toll or other charge upon the transportation of any property or troops of the United States.

"Sec. 6. And be it further enacted, that the United States mail shall at all times be transported on the said railroad under the direction of the post-office department, at such price as the Congress may by law direct.

"Sec. 7. And be it further enacted, that in order to aid in the continuation of said Central railroad from the mouth of the Ohio river to the city of Mobile, all the rights, privileges and liabilities hereinbefore conferred on the State of Illinois shall be granted to the States of Alabama and Mississippi, respectively, for the purpose of aiding in the construction of a railroad from said city of Mobile to a point near the mouth of the Ohio river, and that public lands of the United States, to the same extent in proportion to the length of the road, on the same terms, limitations and restrictions in every respect, shall be, and is hereby, granted to said States of Alabama and Mississippi, respectively." (9 U. S. Stat. at Large, p. 466.)

It will be observed that the words "said Central railroad" occur in the seventh section. The word "Central" does not appear at any other place in the act, and the expression just quoted from section 7 evidently has reference merely to the location of the proposed railroad, and is not intended to designate that railroad as the property of the Illinois Central Railroad Company or of any other company.

Thereafter the State of Illinois accepted the provisions of the act of Congress by the act granting to said company its charter, and also by section 3 of an act of the legislature approved February 17, 1851, which section reads:

"Sec. 3. Be it further enacted, that the act of the Congress of the United States granting lands to the State of Illinois for the purpose of constructing a railroad from a point at or near the mouth of the Ohio to the southern terminus of the Illinois and Michigan canal, with branches

to Chicago and Galena, entitled 'An act granting the right
of way and making a grant of land to the States of Illi-
nois, Mississippi and Alabama, in aid of the construction
of a railroad from Chicago to Mobile,' approved September
twentieth, one thousand eight hundred and fifty, be and
the same is hereby accepted, and all conditions expressed
in said act are hereby agreed to and made obligatory upon
the State of Illinois." (Public Laws of 1851, p. 192.)

The àct creating the Illinois Central Railroad Company
was approved February 10, 1851.  Section 1 so far as
material, section 2, section 3 so far as material, section 15
so far as material, section 18 so far as material, section 22
and section 27 of that act, are as follows:

Section 1 provides that the Illinois Central Railroad
Company is thereby "invested with all the powers, privi-
leges, immunities and franchises, and of acquiring, by pur-
chase or otherwise, and of holding and conveying, real and
personal estate which may be needful to carry into effect.
fully the purposes and objects of this act.

"Sec. 2. The said corporation is hereby authorized and
empowered to survey, locate, construct, complete, alter,
maintain and operate a railroad, with one or more tracks
or lines of rails, from the southern terminus of the Illinois
and Michigan canal to a point at the city of Cairo, with a
branch of the same to the city of Chicago, on Lake Michi-
gan; and also a branch *via* the city of Galena, to a point
on the Mississippi river opposite the town of Dubuque, in
the State of Iowa.

"Sec. 3. The said corporation shall have right of way
upon, and may appropriate to its sole use and control, for
the purposes contemplated herein, lands not exceeding 200
feet in width through its entire length; may enter upon
and take possession of and use all and singular any lands,
streams and materials of every kind, for the location of
depots and stopping stages, for the purpose of constructing
bridges, dams, embankments, excavations, station grounds,

spoil-banks, turn-outs, engine houses, shops and other buildings necessary for the construction, completing, altering, maintaining, preserving and complete operation of said road," etc.

"Sec. 15. For the purpose of securing the construction of said road and branches, the right of way, and all the lands which may be selected along the lines of said road and branches within this State, under the grant made by the government of the United States to the State of Illinois by virtue of 'An act granting the right of way, and making a grant of land to the States of Illinois, Mississippi and Alabama, in aid of a construction of a railroad from Chicago to Mobile,' passed September twentieth (20), eighteen hundred and fifty (1850); and also the right of way which the State of Illinois has heretofore obtained along and on the line of said railroad and branches, as heretofore located and surveyed, for the uses of the same, as well as the lot of ground obtained by the State within the city of Cairo for a depot, and all the grading, embankments, excavations, surveys, work, materials, personal property, profiles, plats and papers, constructed, procured, furnished and done by or in behalf of the State of Illinois, for or on account of said road and branches; also the right of way over and through lands owned by the State, are hereby ceded and granted to said corporation, for the only and sole purpose of surveying, locating, constructing, completing, altering, maintaining and operating said road and branches, as in this act provided and in the manner following—that is to say: * * * That said company shall proceed to locate, survey and lay out, construct and complete said road and branches through the entire length thereof—the main trunk thereof, or central line, to run from the city of Cairo to the southern termination of the Illinois and Michigan canal, passing not more than five miles from the north-east corner of township 21 north, range 2 east of the third principal meridian, and nowhere departing more than seventeen miles from a

straight line between said city of Cairo and said southern termination of said canal, with a branch running from the last mentioned point, upon the most eligible route, to the city of Galena, thence to a point on the Mississippi river opposite the city of Dubuque, in the State of Iowa, with a branch also diverging from the main track at a point not north of the parallel of thirty-nine and a half degrees north latitude, and running on the most eligible route into the city of Chicago, on Lake Michigan; that the central road or main track shall be completed, with at least one line of rails or single track, with the necessary turn-outs, stations, equipments and furnishings, within four years of the date of the execution of said deed of trust, and the branches within six years from the said date," etc.

"Sec. 18. In consideration of the grants, privileges and franchises herein conferred upon said company for the purposes aforesaid, the said company shall, on the first Mondays of December and June in each year, pay into the treasury of the State of Illinois five percentum on the gross or total proceeds, receipts or income derived from said road and branches for the six months then next preceding," etc.

"Sec. 22. The lands selected under said act of Congress, and hereby authorized to be conveyed, shall be exempt from all taxation under the laws of this State until sold and conveyed by said corporation or trustees, and the other stock, property and effects of said company shall be in like manner exempt from taxation for the term of six years from the passage of this act. After the expiration of six years, the stock, property and assets belonging to said company shall be listed by the president, secretary, or other officer, with the Auditor of State, and an annual tax for State purposes shall be assessed by the Auditor upon all the property and assets of every name, kind and description belonging to said corporation. Whenever the taxes levied for State purposes shall exceed three-fourths of one percentum per annum, such excess shall be deducted from the

gross proceeds or income herein required to be paid by said corporation to the State, and the said corporation is hereby exempted from all taxation of every kind, except as herein provided for.   The revenue arising from said taxation, and the said five per cent of gross or total proceeds, receipts or income aforesaid, shall be paid into the State treasury in money, and applied to the payment of interest-paying State indebtedness, until the extinction thereof: *Provided,* in case the five per cent provided to be paid into the State treasury, and the State taxes to be paid by the corporation, do not amount to seven per cent of the gross or total proceeds, receipts or income, then the said company shall pay into the State treasury the difference, so as to make the whole amount paid equal at least to seven per cent of the gross receipts of said corporation."

"Sec. 27. This act shall be deemed a public act, and shall be favorably construed for all purposes therein expressed, and declared in all courts and places whatsoever, and shall be in force from and after its passage."   (Private Laws of 1851, p. 61.)

By the act of the legislature of this State approved February 12, 1855, it is provided:

"Sec. 1. All railroad companies incorporated or organized under or which may be incorporated or organized under the authority of the laws of this State, shall have power to make such contracts and arrangements with each other, and with railroad corporations of other States, for leasing or running their roads, or any part thereof, and also to contract for and hold, in fee simple or otherwise, lands or buildings in this or other States for depot purposes, and also to purchase and hold such personal property as shall be necessary and convenient for carrying into effect the object of this act.

"Sec. 2. All railroad companies incorporated or organized, or which may be incorporated or organized as aforesaid, shall have the right of connecting with each other,

and with the railroads of other States, on such terms as shall be mutually agreed upon by the companies interested in such connection." (Private Laws of 1855, p. 304.)

An examination of the act of Congress herein above in part set out, and of the title thereto, makes it apparent that it was the purpose of that body to assist in the construction of a railroad from the city of Chicago, Illinois, to the city of Mobile, Alabama. By that act the southern terminus of the road in the State of Illinois was to be "at or near the junction of the Ohio and Mississippi rivers," and the road south of the Ohio was to be constructed from the city of Mobile "to a point near the mouth of the Ohio river." Pursuant to the provisions of that act the Mobile and Ohio railroad was built from Mobile to the city of Columbus, in the State of Kentucky, which is situated on the bank of the Mississippi river about twenty miles below Cairo, and for a period of many years connection was made between the two roads by steamboat. Later the lines of the Mobile and Ohio were extended to a point opposite Cairo, where connection was made over the bridge there located from the lines of the Mobile and Ohio to those of the Illinois Central, and *vice versa.*

The act of the General Assembly approved February 10, 1851, cedes and grants to this company all lands which may be selected under the grant made by the government to the State of Illinois by virtue of the act of Congress, setting out the title of the latter act, to-wit, "An act granting the right of way and making a grant of land to the States of Illinois, Mississippi and Alabama in aid of the construction of a railroad from Chicago to Mobile," from which it is apparent that the General Assembly of the State then contemplated the use of some method of transportation by which freight and passengers carried south on the lines of the Illinois Central Railroad Company in Illinois should be transported across the Ohio river, that they might thence be carried by railroad to Mobile or points *en route.* It is

to be observed that the act of Congress by the first section grants the right of way through the public lands "for the construction of a railroad from the southern terminus of the Illinois and Michigan canal" to a point at or near the junction of the Ohio and Mississippi, and by section 7, for the purpose of aiding in "the construction of a railroad" from the city of Mobile to a point near the mouth of the Ohio, grants are made to the States of Alabama and Mississippi. It is apparent that Congress did not make the grants upon condition that the same company should own the railroad throughout its entire length from Chicago to Mobile. The act speaks of the construction "of a railroad" in Illinois and the construction "of a railroad" from Mobile to the mouth of the Ohio. It follows, therefore, that it is a matter of no importance in this litigation that the lines of road now operated by the Illinois Central Railroad Company and owned or leased by that company have their southern terminus at the city of New Orleans, in the State of Louisiana, and not at the city of Mobile, in the State of Alabama. The lines of the Mobile and Ohio and the lines of the Illinois Central now connect at Cairo. Entire trains may be transferred from the lines of one road to the lines of the other. Passengers, freight, mail and express may pass from Chicago to Mobile by a continuous journey by rail, crossing the Ohio at a point near its mouth and near the junction of the Ohio and Mississippi rivers. The purpose of the national Congress in making the original grants has been attained. This view has been taken by the Supreme Court of the United States in the case of *Illinois Central Railroad Co.* v. *State of Illinois,* 163 U. S. 142, where it was said: "The line of railroad communication crossing the Ohio river at Cairo, and of which the Illinois Central railroad forms part, has been established by Congress as a national highway for the accommodation of inter-State commerce and of the mails of the United States, and as such has been recognized and promoted by the State of Illinois.

This will clearly appear by a brief recapitulation of the acts of Congress and the State of Illinois on the subject. * * * The manifest purpose of Congress was to establish a railroad in the center of the continent, connecting the waters of the Great Lakes with those of the Gulf of Mexico, for the benefit of inter-State commerce as well as of the military and postal departments of the government of the United States."

It is contended that notwithstanding this fact the corporation created by this State is, for all purposes of local government, a domestic corporation, and that as to this controversy the Illinois Central stands exactly as if no such purpose had ever been entertained by Congress; that the question of whether this property now under consideration should be taxed as appellee seeks to have it taxed is a matter to be determined precisely as though the Illinois Central Railroad Company was authorized to construct a railroad from the mouth of the Ohio to Chicago, without any regard to the transfer of passengers, freight, mail and express, by rail, from its southern terminus to points beyond the Ohio. This view we think entirely too narrow. It could not reasonably be expected that all traffic to the south on this road should find destination north of the mouth of the Ohio, and while it is true that the question of the taxation of the company is solely a question for the State of Illinois, it is nevertheless true that in determining what property was needful for the operation of a road extending from the northern part of the State to the extreme southern boundary, the legislature could not but recognize the necessity of some means of passing and re-passing the Ohio river, and if the legislature, accepting, as it did, the provisions of the act of Congress, realized, as it must have done, the necessity of the ownership by the Illinois Central Railroad Company of property which would enable its traffic to reach the Ohio river, it would seem to follow that such property necessary for that purpose would fall within the

provisions of the statute providing for commutation of the taxes or for a substituted method of taxation.

It is also urged that the bridge approach is, in law, a part of the bridge, and many authorities are cited in support of this proposition. It is then contended that the earnings of the bridge proper should be so apportioned as that a part thereof should be treated as the earnings of this approach; that none of the earnings of the bridge proper are credited to this approach; that as the Illinois Central Railroad Company has not elected to treat the portion of the earnings of the bridge proper which are, in fact, the earnings of the approach as a part of the earnings of its charter lines, appellants cannot say that the approach in question is to be regarded as a part of the charter lines of the Illinois Central. In other words, that as the company does not pay taxes on the approach, or money in lieu thereof, in the manner that the law requires it to pay upon its charter lines, it should be required to pay taxes in the method prescribed by the general laws of the State for the taxation of railroad property. The failure of a tax-payer to comply with the law in reference to the payment of his taxes has nothing to do with the determination of the method by which the property should be taxed. If the Illinois Central Railroad Company is not paying the proper percentage of the earnings of this approach into the State treasury it should be required to do so, but its failure so to do does not alter the law.

It is also contended that under the contract which the Illinois Central has with the Mobile and Ohio, and under the practice of the Illinois Central by which an arbitrary charge or toll is levied upon freight passing over the bridge, on account of its so passing, the bridge, including this approach, is, in fact, a toll bridge. The contention further is, that under its charter the company has no right to maintain a toll bridge; that even if this approach might, under some circumstances, be exempt from ordinary taxation, it is not now so exempt because it is now devoted to a use not con-

templated by the charter. Attention is called by appellee, in this connection, to the cases of *In re Swigert,* 119 Ill. 83, and *Illinois Central Railroad Co.* v. *People,* 119 id. 137. In those cases the question was whether a grain elevator known as the "Cairo elevator," and located on ground owned by the Illinois Central Railroad Company in the city of Cairo and leased to the firm of Halliday Bros., was exempt from taxation under sections 18 and 22 of the charter of that company. The court held that it was not so exempt, on the ground that it had no necessary connection with the construction, maintenance or operation of the company's road. The approach is not in the same class. It is directly and continually used in the operation of the lines of the Illinois Central. It is used in the business of operating a railroad, and in no other business. By the sections of the act of February 12, 1855, above set out, the Illinois Central Railroad Company was authorized to make contracts with other roads by which other roads might use the tracks of the Illinois Central. While it is true that if the legislature, by an act subsequent to the charter, empowered the company to acquire and hold property which it was not by the charter authorized to acquire and hold, such property would not come within the charter exemption, it is also true that when the law-makers by the act of 1855 authorized the company to lease its tracks to other companies, a use of the tracks by another company under such a lease would not be a use for other than railroad purposes, as was the use of the elevator. It matters not what name is given to the earnings resulting from the use of the charter line tracks of the company by other companies, they are still a part of "the gross or total proceeds, receipts or income derived from said road and branches."

It is also insisted that this approach is taxable under the law as announced by this court in *Illinois Central Railroad Co.* v. *Irvin,* 72 Ill. 452. In that case it was held that a steamboat owned by the company for the purpose of carry-

ing passengers and freight between Cairo, Illinois, and Columbus, Kentucky, thereby making a connection between the northern terminus of the Mobile and Ohio railroad and the southern terminus of the Illinois Central railroad, was not exempt from taxation by virtue of the provisions of the charter, on the ground that a steamboat is not railroad property, and that the right of carrying by rail, possessed by the Illinois Central Railroad Company under its charter, does not include, as a necessary incident, the right to carry by water. It is apparent that that case is not in point. This approach is like unto a switch track which would carry the cars of the Illinois Central Railroad Company from its main track to the wharf at the river's edge, and is unlike an instrumentality for transporting cars or passengers and freight upon or over the stream.

In *People* v. *Illinois Central Railroad Co.* 215 Ill. 177, it was held that the property here involved could not be taxed by the local assessor. Whether it could be taxed by the State Board of Equalization was not there decided, but it was there determined that this approach was used exclusively for railroad purposes and came within the denomination "railroad track." We are satisfied that the use which has been made of this approach is not such as would warrant us in holding that it was taxable by ordinary methods, as was the case with reference to the steamboat and the elevator.

The parties hereto agree that the Federal government required the bridge in question to be built at a height of 53 feet above high-water mark on the Ohio river. This requirement has made necessary the expenditure of a large sum of money in the construction of this approach. Had the bridge been constructed on the same grade as the main tracks of the charter lines of the Illinois Central Railroad Company, the only thing necessary to make the connection between the rails on the bridge and such main tracks would have been a comparatively inexpensive switch track. It

cannot be seriously contended that the greater expense of the method necessarily pursued under regulations established by the government of the United States in providing a way whereby cars might pass from the main tracks of the Illinois Central Railroad Company on the Illinois shore to the tracks on the west end of the bridge, and from the tracks on the bridge to the main tracks of the company in Illinois, would affect the question as to whether or not the property made use of for that purpose is exempt from ordinary taxation.

It is to be observed that no traffic of any character originates along this approach and that no passengers, freight, express or mail find a destination at any point which it touches. In this respect it is entirely different from an ordinary branch or lateral line. (*Chicago and Eastern Illinois Railroad Co.* v. *Wiltse,* 116 Ill. 449.) Section 1 of the charter vests the Illinois Central Railroad Company with the power of acquiring and holding all "real and personal estate which may be needful to carry into effect fully the purposes and objects of this act." The third section authorizes the company to acquire land "for the location of depots and stopping stages, for the purpose of constructing bridges, dams, embankments, excavations, station grounds, spoil-banks, turn-outs, engine houses, shops, and other buildings necessary for the construction, completing, altering, maintaining, preserving and complete operation of said road." In *In re Swigert, supra,* it was said that the enumeration in this charter of property that may be acquired by the corporation "doubtless includes the road, with all necessary switches and turn-outs."

In *Lake Shore and Michigan Southern Railway Co.* v. *Baltimore and Ohio and Chicago Railroad Co.* 149 Ill. 272, the appellee sought in the county court to condemn a strip of land for the purpose of connecting its tracks with the tracks of the Chicago, Rock Island and Pacific Railway Company. It was there contended that the petitioner was

without the power to condemn, for the reason that the connection which it proposed to make was either a branch line or a re-location of the main line, but it was held that the proposed connection, which was not over 800 feet in length, was not a branch road and was not a re-location of the main line, but that it was a side-track needful for the operation of the main line; and it was further said, that "the grant of power to locate and construct a railway carries with it the right to construct turn-outs, sidings and such conveniences as are usual in the necessary operation of the road," and that the act of 1872, "while requiring the persons incorporating the company to name the places from which and to which it is intended to construct the proposed railway, lays down no limitation as to the places where such switches, side-tracks or turn-outs are to be constructed."

We conclude, upon consideration of the fact that the act creating the Illinois Central Railroad Company was passed, in part, for the purpose of carrying out the object of the national Congress as expressed in the act of Congress approved September 20, 1850, upon consideration of the various provisions of the charter of that company, and upon consideration of the language used and the conclusions reached by this court in the two cases last referred to, that it is clear and certain that power to acquire and construct this approach for the purpose of connecting the main tracks of the charter lines of the Illinois Central Railroad Company in Illinois with the tracks upon the bridge over the Ohio at the east line of the State was granted by the charter to the company, and that the approach is therefore within the exemption created by sections 18 and 22, *supra*. This approach must be regarded as a switch or side-track "needful to carry into effect fully the purposes and objects" of the act, and not as a branch or lateral railroad.

The question whether the sections of the charter providing for the commutation of the taxes of the Illinois Central Railroad Company or for substituted taxation of its

property should be liberally or strictly construed has been much discussed. We find it unnecessary to determine that question, for the reason that in our view the property involved in this litigation comes clearly within that class of property exempted from ordinary taxation by the charter, whether the sections in question be liberally or strictly construed.

It is also urged that long prior to the construction of this approach the power of the Illinois Central Railroad Company to condemn lands for the purpose for which this approach is used had been exhausted, and that as it could not acquire this property by condemnation it could not acquire it for the purposes contemplated by its charter, and therefore could not hold it free from such taxation as is imposed by the general law. The power to acquire land by condemnation for side or switch tracks, such as this, is not exhausted by an apparent completion of the road, but may be exercised as other or additional conveniences of this character may become needful or requisite for the operation of the railroad. (*Chicago, Burlington and Quincy Railroad Co.* v. *Wilson,* 17 Ill. 123.) The power to acquire land for switch or side-tracks "is a continuing power, which may be exercised from time to time as the needs of the company may require." *Chicago and Western Indiana Railroad Co.* v. *Illinois Central Railroad Co.* 113 Ill. 156.

Whether the approach is, in law, a part of the bridge so as to draw to itself a portion of the earnings of the bridge proper which are now not credited to the approach or to the charter lines in Illinois, is not for our consideration or determination in this suit.

The judgment of the circuit court will be reversed and the cause will be remanded, with directions to overrule the demurrer to the answer.

*Reversed and remanded, with directions.*